UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,    )
    )
    Plaintiff    )    No: 22-cr-10308-RGS
    )
    v.    )
    )
SCOTT JAMESON,    )
    )
    Defendant    )
_____ )

## SENTENCING MEMORANDUM

Scott Jameson is a 46-year-old man who has, until recently, lived a simple, successful, and law-abiding life. He does not abuse alcohol or drugs, is close with his family, and succeeded in supporting himself financially in the entertainment industry since graduating from high school over 20 years ago. As discussed below, he is an individual who is ashamed by his offense and has already taken to steps to rehabilitate himself.

Mr. Jameson has admitted to Transportation of Child Pornography, in violation of 18 U.S.C. §2252A(a)(1), and Engaging in Illicit Sexual Conduct in a Foreign Place, in violation of 18 U.S.C. § 2423(c). His offenses stem from a video that he took while in Cambodia. In the video, Mr. Jameson is joking around with multiple children. They are making faces for the camera. One boy is reclining and looking at Mr. Jameson's phone, which has been set up as a viewfinder for the camera. Mr. Jameson passes the camera into the leg of the child's shorts and, finding that the child wore no underwear, focused the camera for several seconds on the child's genitals. This was not done surreptitiously;

the child was watching Mr. Jameson's phone as he did this. The child did not appear bothered by what Mr. Jameson had just done. When agents met with the child, he had no memory of the event and denied that he had been exploited.[1]

Mr. Jameson was stopped by Customs and Border Patrol upon his return to the United States. His electronic devices were seized and searched. Mr. Jameson is not, and has never been, charged with any contact offense nor has he ever had sexual contact with a child.[2] He was interviewed and asked about the offending video. Agents asked if he had any other illicit images on his devices and he told them that he did not.

Mr. Jameson was permitted to leave the airport after the interview. CBP kept his devices and provided them to HSI. Agents did a further review of his electronics and found cached thumbnail images[3] of approximately 100 child pornography images on his laptop. Mr. Jameson had been sincere in his representation that there were no other illicit images on his devices. He was not aware that the residue of images remained on his hard drive. Since the outset of the case, Mr. Jameson has expressed confusion and regret about his conduct, as well as a genuine openness to exploring what led to his misconduct through mental health treatment.

In light of his offense, his background, his post-arrest conduct, and the need to prevent unwanted disparities, the Court must determine what sentence is "sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in 18

---

[1] This was described to undersigned counsel by AUSA Noto in a phone call.

[2] Agents in Cambodia interviewed the children in Mr. Jameson's videos. The video that has been described is the only one that qualifies as child pornography.

[3] Cached data is information stored on a computer after a user visits a website or app for the first time. The computer stores the data so that the load time is quicker when a user returns to the same website or app. A thumbnail image is a reduced-size version of an image viewed online. Microsoft OS refer to cached data as "Temporary Internet Files." These files remain on the hard drive unless and until they are deleted.

U.S.C. § 3553(a)(2). After consideration of the advisory United States Sentencing Guidelines and the applicable factors contained in 18 U.S.C. § 3553(a), Mr. Jameson requests that this Court impose a sentence of **60 months (the mandatory minimum) to be followed by 5 years of supervised release**. This sentence is appropriately harsh, consistent with sentences given to others with similar backgrounds and similar offenses, and meaningfully achieves the statutory purposes of punishment.

## <u>Background</u>

Scott Jameson was born on February 15, 1977 in Boston. Presentence Investigation Report ("PSI") at ¶53.  He is the younger of two boys born to Susan James and Edward Jameson. ¶53. He grew up in a caring and happy home with his brother and parents in Berlin, MA. Both his parents were schoolteachers.

Mr. Jameson's parents divorced when their sons were in their 30's. His father is 80 years-old and his mother is 77. They both live independently. His mother, Susan, relies on Scott to drive her and help around the house. Exhibit A, letter from Susan James. She struggles with balance and does not feel comfortable walking unassisted. Scott and his brother, Marc, live together in a house owned by Scott. They have lived together for approximately 6 years.

Mr. Jameson has been interested in magic since he was young. He studied the craft and was successful as a self-employed magician for 23 years until he was charged in the instant offense. He told his family about his encounter with law enforcement immediately and they have supported him throughout. They were all in court with him at his Rule 11 hearing.

Susan writes of her son, "Scott has voiced no enmity toward the government and

police. He understand that an important role of the government is to protects its citizens and that his conduct has caused harm." Exhibit 1.

**The Arrest and Search**

On October 21, 2022, Mr. Jameson was stopped for questioning by Customs and Border Patrol at Logan Airport. PSI at ¶10.  In February of 2022, the FBI had received a tip from a non-governmental organization in Cambodia that Jameson may be engaging in inappropriate behavior with minors. Specifically, an employee of the NGO observed Jameson with a Cambodian boy and his mother at a park, where Jameson was seen showing the boy his phone, buying food, and hugging him. No action was taken at the time, even when Jameson flew back to the United States from Cambodia. Jameson returned to Cambodia in August of 2022. He was in the country shooting footage for his YouTube channel, "Walking with Monks"[4] and teaching English to the children who lived there.[5] Mr. Jameson's electronics were seized, which included camera equipment, digital storage devices, and his laptop.

The agents questioned Jameson about the video that showed the child's genitals, and he admitted that the video was inappropriate. Agents found selfies taken by several boys at the Pagoda, some of whom were not wearing shirts.[6] Jameson had not known

---

[4] https://www.youtube.com/channel/UCC6LpJlBAD2rA4DwImZv1-A/videos
[5] Mr. Jameson did not live at the Orussey Pagoda, but occasionally stayed overnight in order to film early-morning rituals. At the pagoda, residents and visitors slept in communal rooms. The rooms had three raised platforms covered by a mat large enough to sleep three to four people. Children and adults slept in the same communal rooms. Individuals were not assigned a space to sleep; everyone had their own pillow and blanket and would find a space on one of the mats. It was not unusual for boys and men to sleep on the same mat. Contrary to what was reported in ¶ 9 of the PSR, Mr. Jameson denies holding hands or hugging anyone while they were sleeping. He has no memory of sleeping between boys but acknowledges that it is possible that he did.
[6] The PSR and law enforcement reports describe the boys as "topless" which has a sexualized intonation. The photos were of boys living in a in a hot country, some of whom who were not wearing shirts. Cambodia is hot and humid year-round. Phnom Penn is typically in the low 80's in the early fall. Mr. Jameson never asked them to take off their shirts.

that the boys had taken the photos, nor had he requested that they take them. Upon discovering the selfies on his phone, he did not delete them, nor did he think they were problematic. He explained this to the agents.

Mr. Jameson was permitted to leave the airport after the interview. CBP kept his devices and turned them over to HSI. The agents did a further review of his electronics and found thumbnail images of approximately 100 child pornography images that had been viewed on Jameson's laptop. Mr. Jameson had been mistaken in his sincere belief that there were no other images on his devices. He was not aware that the residue of images viewed previously remained on his computer.

**Mental Health Treatment and Forensic Evaluation**

Mr. Jameson began engaging in psychological treatment shortly after his arrest, reflecting his desire to have a better understand of his behavior and to change it. His treatment provider, Dr. Eric Brown, is also an experienced forensic evaluator who has testified over fifty times before the Sex Offender Registry Board and in the Massachusetts Superior Court. Dr. Brown has prepared a psychological evaluation and risk assessment. Exhibit B. Mr. Jameson does not have a history of deviant behavior and has enjoyed intimate relationships with adult women. He understands the harm that he has caused both from downloading pornography from the internet and from creating the video. Dr. Brown has determined that Mr. Jameson has an addiction to pornography and began viewing child pornography when he became bored with adult images. Dr. Brown found that his patient did not indicate sexual attraction to children and had no desire to commit a contact offense with a child, which contributed to his opinion that Mr. Jameson presents an extremely low risk of reoffending. Mr. Jameson has a close-knit family that are aware of his offenses, understand the gravity of the misconduct, and

support him without hesitation. This support network is an important factor in finding

that Mr. Jameson is at a very low risk of reoffending.

## **ARGUMENT**

Mr. Jameson requests that this Court impose a sentence of no more than **60 months to be followed by 5 years of supervised release.**  This recommendation considers without wholly adopting the framework provided by the United States Sentencing Guidelines, and is sufficient to promote respect for the law and serve the purposes of punishment, rehabilitation and deterrence, pursuant to 18 U.S.C. §3553, while recognizing the unique circumstances of this case.

## I.    **The Probation Department Erred in its Multiple Count Adjustment in the PSR**

Mr. Jameson objects to the multiple count adjustment. Both counts involve a single offense: the video described in ¶ 11 was recorded in a foreign place and then transported into the United States. The two charges should be grouped together. USSG § 3D1.1. While there approximately 100 thumbnail images cached in the laptop, reflecting that the images had been viewed at some point on the laptop, Mr. Jameson was not aware that the images remained on his laptop. Transporting child pornography is not a strict liability crime: the accused must *knowingly* transport the image(s). The only file that forms the basis of the transportation charge is the video described in ¶ 11, which also forms the basis of Count 1. Similarly, possession of child pornography also requires the possession to be knowing, as does receipt. The presence of cached images on the laptop, unknown to Mr. Jameson, does not justify the multiple count adjustment.

The PSR states that Mr. Jameson's Advisory Guidelines Range is 97 to 120

months based on an offense level of 30 and a criminal history category of I. PSR ¶ 75.
Defendant maintains that the 1-point increase for multiple counts should not be applied,
resulting in an offense level of 29 and a criminal history of I. Mr. Jameson's position is
that his Advisory Guidelines Range is 87 to 108 months.

## II.    THE FACTORS SET FORTH IN 18 U.S.C. § 3553(A) COMPEL THE CONCLUSION THAT THE GUIDELINE RANGE IS OVERLY PUNITIVE AND SUPPORT A SENTENCE BELOW THAT RANGE

In crafting an appropriate sentence, the Court must consider the relevant §
3553(a) factors. One of those factors is the guideline range. The Supreme Court has
firmly instructed that sentencing courts "may not presume that the Guidelines range is
reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007) (citing *Rita v. United States*,
551 U.S. 338 (2007)).  Rather, a sentencing court must make an "individualized
assessment based on the facts presented." *Id.* Above all, a court's final determination of
a sentence must reflect "§ 3553(a)'s overarching instruction to 'impose a sentence
sufficient, but not greater than necessary,' to accomplish the sentencing goals advanced
in 3553(a)(2)[,]" namely, retribution, deterrence, incapacitation, and rehabilitation. See
*Kimbrough v. United States*, 552 U.S. 85, 110  (2007). Additional statutory concerns
include the nature and circumstances of the offense, the history and characteristics of
the defendant, and the need to avoid unwarranted sentencing disparities among
defendants with similar records who have been found guilty of similar conduct. 18
U.S.C. § 3553(a).

Here, the soundness of *Gall*'s warning against the presumptive reasonableness of
the sentencing guidelines is particularly cogent. The applicable base offense level and
related special offender characteristics contained in § 2G2.2 are fundamentally flawed,

as argued in detail below. The consequences of these flaws – sentencing ranges that far exceed the appropriate level of punishment considering the particular circumstances of this case – are immediately apparent when the guidelines are employed in practice. The Court should impose sentence of 60 months in order to best serve the statutory purposes of punishment articulated to comply with the mandate of 18 U.S.C. § 3553(a).

In short, Mr. Jameson is not the dangerous offender Congress envisioned when it repeatedly ratcheted up the child pornography guideline. Extended incarceration is unnecessary to protect the public from a defendant who does not present a threat to public safety despite transgressing its laws and mores.

### III.    THIS COURT SHOULD CONSIDER THE SHORTCOMINGS IN § 2G2.2 AND DEPART OF POLICY GROUNDS

While there are enhancements in §2G2.2 that apply as a matter of law, the court should consider the flaws with these guidelines when determining the appropriate sentence. Many courts have recognized the shortcomings of §2G2.2 and have used their authority to reject the provision for policy reasons, and this court should do the same. *Kimbrough* "makes manifest that sentencing courts possess sufficient discretion under section 3553(a) to consider requests for variant sentences premised on disagreements with the manner in which the sentencing guidelines operate." *United States v. Rodriguez,* 527 F.3d 221, 231 (1st Cir. 2008) (reversing). The Supreme Court has emphasized that the point of *Kimbrough* is to recognize the "district courts' authority to vary from the Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears v. United States,* 555 U.S. 261, 129 (2009). Many courts have accepted this invitation in the context of the child pornography guidelines, finding them to be flawed,

duplicative, and irrational. See *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (in child pornography cases, "[d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2, bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.").

The First Circuit has expressed its opinion that §2G2.2 is "harsher than necessary" and, in one case, stated that "[w]ere we collectively sitting as the district court, we would have used our *Kimbrough* power to impose a somewhat lower sentence." *United States v. Stone*, 575 F.3d 83, 89-94 (1st Cir. 2009). Other circuit courts have taken similar positions regarding § 2G2.2. See, e.g., *United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011) (holding that, "similar to the crack cocaine Guidelines, district courts may vary from the child pornography Guidelines, §2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case.")

1. *The Legislative History of §2G2.2 Produced An Irrationally Inflated Base Offense Level*

Many scholars and commentators have observed that the driving force behind the development of the child pornography guideline has been moral outrage, panic, and legislative grandstanding, rather than empirical evidence and analysis of past practice on the part of the Sentencing Commission.[7] The guideline's evolution reveals a sizable role played by Congress in the process, "prompting the Commission to respond to multiple public laws that created new child pornography offenses, increased criminal

---

[7] See T. Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (2009), at 3 (available at https://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2016/report_stabenow.pdf)

penalties, directly (and uniquely) amended the child pornography guidelines, and required the Commission to consider offender and offense characteristics for the child pornography guidelines."[8] This co-opting of the Commission's role has resulted in nine revisions to the guideline increasing its penalties since their promulgation in 1987.[9]

In individual cases, this has created a situation where the guidelines are not only empirically unsound, but produce irrational results. Here, for instance, the guidelines analysis, according to the PSR, puts Mr. Jameson in a range that reaches twice the mandatory minimum, a result which seems disproportionately severe, given that he is a first-time, non-violent offender and there are no allegations that he was using the offending video to entice potential victims nor that he  intended to disseminate the footage.

2. *The Specific Offense Characteristics Produce a Sentence Which is Excessive and Profoundly Unfair*

The combination of § 2G2.2's 24-point base offense level for Engaging in Illicit Sexual Conduct in a Foreign Place and its Specific Offense Characteristics can deliver a devastating result to first-time, nonviolent offenders. In Mr. Jameson's case, the addition of the 8-point increase for the "pre-pubescent minor" increases the base offense level by 33% and almost triples the sentencing range he faces. While the "Prepubescent Minor" enhancement undoubtedly applies, the Court should consider that this enhancement is highly probleamtic when determining the appropriate sentence.

---

[8] *Id.*
[9] United States Sentencing Commission, *Report on the History of the Child Pornography Guidelines* at 54 (Oct. 2009) (available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex- offenses/20091030_History_Child_Pornography_Guidelines.pdf) ("Commission Report").

In fiscal year 2022, the prepubescent minor enhancement was present in 94.4% of § 2G2.2 cases,[10] and in fiscal year 2021 in 95.1% of the cases.[11]  An element common to nearly every offense should not merit increased punishment under the guise of a "Specific Offense Characteristic." The sentencing judge in *United States v. Hanson*, 561 F.Supp.2d 1004 (E.D. Wisconsin 2008), cited the ubiquity of this enhancement as the most compelling reason not to apply it.

> As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images)."

*Hanson*, 561 F. Supp. 2d at 1010 (internal citations omitted).

In numerous instances in this district, the court has specifically cited the flaws in this guideline, and the related specific offender characteristics. See, e.g., *U.S. v. Gale*, 10-cr-30023-MAP (sentence of 60 months down from 168-210 because, *inter alia*, "the guideline enhancements artificially and arbitrarily inflate the punishment" for child pornography cases [Judgment and Commitment]); *U.S. v. Pavlis*, 10-cr-40032-FDS (sentenced to 33 months despite a 57-71 month GSR because, *inter alia*, "the two-level enhancement for use of a computer and the two-level enhancement for prepubescent images produced an unduly high sentence, as those factors are present in close to 100% of child pornography sentencings." [Judgment and Commitment]); *U.S. v. Brown*, 1:12-cr-10358-NMG (sentence of 36 months from 63-78 months with the court finding that

---

[10] USSC Report FY 2022. "Use of Guidelines and Specific Offense Characteristics" at 98. Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2022/Ch2_Offender_FY22.pdf
[11] USSC Report FY 2022. "Use of Guidelines and Specific Offense Characteristics" at 98. Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2021/Ch2_Offender_Based.pdf

prepubescent minor and computer use  enhancements are "redundant and would result
in a sentence greater than necessary." [Judgment and Commitment])

While Mr. Jameson concedes that the offense characteristic is applicable, he
reiterates that application produces an outcome that is demonstrably excessive, and
deference to the guideline is unwarranted.

**IV.    A SENTENCE IN EXCESS OF 60 MONTHS WOULD CREATE
        UNWARRANTED DISPARTIY COMPARED TO OTHER CASES CHARGED
        PURSUANT TO 18 U.S.C. § 2252A.**

In this district, a sentence significantly below the guidelines for child pornography
cases is so common that it more the rule than the exception. For example, undersigned
counsel has identified the following transportation of child pornography cases in this
district where a below-guidelines sentence was imposed, with the sentence and
otherwise-applicable GSR noted in parentheses.

| Case | GSR | Sentence |
|---|---|---|
| *United States v. Wright*, No. 10-cr-10362-JLT | 70-87 months | 60 months |
| *United States v. Grullon*, No. 14-cr-10171-LTS | 121-150 months | 60 months |
| *United States v. Oake*, 11-cr-10106-NMG | 97-121 months | 64 months |
| *United States v. Noble*, 11-cr-10284-NMG | 151-188 months | 81 months |
| *United States v. Lunt*, 10-cr-10175-GAO | 151-188 months | 96 months |
| *United States v. Shipps*, 13-cr-10106-NMG | 360+ months | 240 months |

In the first three cases listed in the table, where the court imposed sentences of
60 months, 60 months, and 64 months respectively, despite higher guidelines, the
defendant was a first time offender (like Mr. Jameson.) (See Judgment and
Commitment). In several instances in this district, the court has specifically cited the
flaws in this guideline, and the related specific offender characteristics.

Mr. Jameson transportation charge arises from transporting the video that he
had recorded while traveling abroad, which forms the basis of his conviction pursuant to

18 USC § 2423(c). Recognizing that Mr. Jameson's video, distinguishes his case from the others cited, he asks that the Court consider the nature of the recording, while wholeheartedly admitting that it is child pornography.[12] The video shows Mr. Jameson joking around with multiple children. The children are making faces for the camera. One child is in a reclining position while looking at Mr. Jameson's phone, which he had set up as the viewfinder for the camera. Mr. Jameson pointed the camera into the leg of the boy's shorts, focusing on the boy's penis for several seconds, knowing that the boy was watching his antics on the phone. The boy does not show any anger or embarrassment by what Mr. Jameson has done. When agents met with the child, he had no memory of the event and denied that he had been exploited.

## V.   THE REQUESTED SENTENCE MEANINGFULLY CONSIDERS THE §3553 FACTORS AND FURTHERS THE STATUTORY PURPOSES OF SENTENCING

The Court must fashion a sentence that considers the nature and circumstances of the offense in the context of Mr. Jameson's background. 18 USC §3553(a)(1). Mr. Jameson has lived a quiet life. He performed as a magician since shortly after graduating high school with sufficient success to be financially independent. Mr. Jameson is a forty-six-year-old man with no criminal record, juvenile adjudications, or restraining orders. ¶¶ 45-51. Until October of 2022, he had never even been arrested. He was raised in Massachusetts in a close-knit family, and he has a strong family support network. His father, mother, and brother were in court with Mr. Jameson for his Rule 11

---

[12] The only case that undersigned counsel could find in this district where an individual was convicted for violating 18 U.S.C. § 2423(c), Engaging in Illicit Sexual Conduct in a Foreign Place, involved a man who travelled repeatedly to the Dominican Republic to engage in sex with a 14-year-old girl. *United States v. Gallant*, 12-cr-40041-TSH (sentenced to 100 months which was below the GSR of 135 -168.)

hearing and have supported him since his arrest. Mr. Jameson's history and
characteristics support the requested sentence.

**V.    The Requested Sentence is Sufficient to Meet the § 3553(a)(2)
Purposes of Punishment in This Case**

Considering Mr. Jameson's acceptance of responsibility, his background and
circumstances, and his low risk of reoffense, a sentence of 60 months incarceration is
"sufficient but no greater than necessary" to meet the § 3553(a) punishment goals of
protection of the public, incapacitation, deterrence, just punishment, and treatment.

*1.   The Requested Sentence is Sufficient to Provide Just Punishment §3553(a)(2)(A).*

Mr. Jameson's crime is serious, and through his acceptance of responsibility, he
has acknowledged that his past actions merit punishment. However, a sentence of 60
months – the minimum allowed under the statute - is "sufficient" within the meaning of
§ 3553(a). In addition, a sentence of 60 months would promote respect for the law
pursuant to §3553(a)(2)(A) because "the unique facts of [Mr. Jameson's] situation"
support the conclusion that, "a sentence of [excessive] imprisonment may work to
promote not respect, but derision, of the law if the law is viewed as merely a means to
dispense harsh punishment without taking into account the real conduct and
circumstances involved in sentencing." *Gall*, 552 U.S. at 54. In addition, a reasonable
prison term promotes respect for the law by taking into account that Mr. Jameson was
successful on pre-trial release.

Further, without attempting to diminish the wrongfulness of Mr. Jameson's
conduct, it should be noted that the "engaging in illicit sexual conduct in a foreign place"
charge to which he has pleaded guilty, imposes high guidelines in contemplation of

conduct far more damaging than the illegal acts committed by Jameson.[13] This particular criminal statute seeks to penalize and deter Americans from traveling abroad to exploit children. Traveling abroad to engage in sexual conduct with children is commonly referred to as "sex tourism," which undermines the harm done to it victims. Certainly, filming child pornography while abroad is a criminal act that falls under this statute and is deserving of severe punishment. In Mr. Jameson's case, he began with a childish prank on the victim by pointing a camera into his shorts as the boy watched the live footage on his phone. Upon seeing that the boy was not wearing underwear, Mr. Jameson pointed the camera at the boy's genitals for several seconds, which changed the video from an unseemly childish prank to child pornography. When confronted about this video by CBP agents, Mr. Jameson admitted that the video was "inappropriate."

When transportation of child pornography was originally added to the criminal code in September of 1996 as part of Pub. L. 104–208, the internet was still very much in its infancy, and child pornography was a contraband material, like drugs or guns, that had to *travel physically* from point A to point B, in order for exchanges to be made. The law sought to deter that activity – the physical transportation of contraband that was necessary to facilitate the trade in child pornography – in the same way that the criminal code generally treats those who traffic guns or drugs more harshly than those found simply to be in possession of them. That dynamic has long since changed; child pornography is now overwhelmingly traded digitally and, had it been Mr. Jameson's

---

[13]In *United States v. Gallant*, 12-cr-40041-TSH, Judge Hillman sentenced Mr. Gallant, who had travelled repeatedly to the Dominican Republic to engage in sex with a 14-year-old girl, t0 100 months despite a GSR of 135-168. Judge Hillman reasoned that "100 months of incarceration should be significant enough to incapacitate and punish the defendant for his crimes, but does not ignore his personal history and characteristics, including the fact that he has no meaningful criminal history." (Judgment and Commitment)

intention to traffic or facilitate the transfer of child pornography to other individuals, it seems far more likely that he would have done so via file-sharing programs or otherwise transmitted it electronically. Any of these methods could be accomplished without physically carrying devices that contained these files. Mr. Jameson did not intend to disseminate this footage (nor is there any evidence to suggest otherwise), the feature that the enhanced penalty for transportation is intended to deter. Although by carrying a storage device containing the recording, Mr. Jameson's conduct violated the terms of 18 U.S.C. §2252A(a)(1), this variety of transportation seems somewhat removed from the conduct that the law originally sought to proscribe.

In considering what is "just" in this case, this Court, like many other courts before it, should consider the fact that a conviction of this type of crime carries perhaps more collateral consequences than any other crime. See e.g., *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (affirming on plain error review district court's finding that the collateral consequences of defendant's child pornography conviction should factor into its analysis of what constitutes "just punishment,").   Consequences will span from the officially sanctioned to a long litany of informal, but inevitable, hurdles that will confront Mr. Jameson for the rest of his life.

Even before he is released, Mr. Jameson will likely have to spend his sentence isolated from other inmates, because those convicted of sex crimes involving children are notorious targets in the prison system. Mr. Jameson will be left to choose between a lock-down unit, which would isolate him for the next five years, or to take his chances in general population and hop that no one will learn his secret.

In addition, primary among the official sanctions is the fact that Mr. Jameson will be subject to serious restrictions and reporting requirements for many years under

federal and state law. *See* 42 U.S.C. §§ 16911, 16915(a)(1) (fifteen years for lowest risk federal offenders); § 16915(b) (possibility of early termination for federal offenders after ten years). In addition, while most convicted felons have a hard time finding employment, it is particularly difficult for those convicted of sex offenses involving children. See, *United States v. Garate*, 543 F.3d 1026 (8th Cir. 2008) (court properly considered lasting effects of registering as a sex offender in deciding to impose below-guideline sentence.)

It is easy to allow revulsion at the nature of the crime to color the determination of what might be "just" in these circumstances. Mr. Jameson is a 46-year-old man who has never experienced incarceration prior to this case. He will now spend a significant period of time in a federal prison and will spend every day there as a member of the lowest, most despised caste in the penal system. If he is extremely fortunate, he might emerge from the experience unscathed; if not, he will likely carry the physical and psychological trauma of his experiences with him for the rest of his life.  Upon release from prison, Mr. Jameson will be in his 50's with a stigma that renders him unemployable in all but the most menial, low-paying jobs. Mr. Jameson's parents may no longer be alive, and he will rely entirely on his brother. Mr. Jameson can expect ostracism, if not outright harassment, from his neighbors once his status is known. A 60-month sentence  is sufficiently harsh to achieve the purposes of sentencing, but not more punitive than necessary.

2. *The Requested Sentence Will Afford Adequate Deterrence to Future Criminal Conduct and Protect the Public Pursuant to §§ 3553(a)(2)(B) and 3553(a)(2)(C).*

Many factors suggest that Mr. Jameson's arrest alone provided adequate deterrence from future offending. In some ways his arrest and sentence (irrespective of

incarceration length) have disrupted his life and prompted him to seek therapeutic intervention. Dr. Brown's opinion is that Mr. Jameson presents a very low risk of reoffending. Of consideration is that he is ashamed of his offense, motivated to succeed, responsive to treatment, and compliant with supervision. Mr. Jameson is a first-time offender, and has been consistently employed throughout his adult life until is arrest on the instant offense.

The requested 60-month sentence will also provide Mr. Jameson with an opportunity to seek out additional treatment that he needs to address the causes underlying his crime. Mr. Jameson began mental health treatment shortly after his arrest. PSI ¶ 63. He would like to continue with mental health treatment after sentencing. Mr. Jameson has been receptive psychological treatment, having taken steps shortly after his arrest to address his underlying psychological issues.

Mr. Jameson will, upon release from prison, face a lengthy, if not lifetime, period of state supervision through registration requirements, during which he will be subject to intense scrutiny. While on supervised release, his use of electronic devices will be subject to considerable restrictions and monitoring. His devices will be subject to random searches given the nature of the offense.

With respect to general deterrence, there is significant research suggesting that while *certainty* of punishment provides a specific deterrent effect, long prison sentences are not an effective method for combating recidivism. In some circumstances, a longer sentence can have the perverse consequence of *increasing* the likelihood of re-offense, by undercutting the defendant's social connections to family, community, and employers. A lengthy prison stay may in fact have a negative impact on Mr. Jameson's rehabilitation. Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice:*

*Evaluating Certainty v. Severity of Punishment* (2010) ("Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.")[14]; *see also* Roger Warren, National Institute of Corrections, *Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries* (2007) ("The research evidence is unequivocal that incarceration does not reduce offender recidivism. . . Incarceration actually results in slightly increased rates of offender recidivism.").[15]

The true linchpin in deterring future criminal conduct is a treatment plan that helps Mr. Jameson deal with the complex issues and the difficult future that he faces.

Mr. Jameson's requested sentence is reasonable when considering his circumstances and the sentencing trend in this District. A 5-year custodial sentence, followed by 5 years of supervised release serve the goals of sentencing.

## CONCLUSION

The majority of Scott Jameson's life suggests a strong desire and a demonstrated capacity to live as a law-abiding citizen.   His offense is serious and involves a taboo that evokes a visceral reaction toward punishment. The development of USSG §2G2.2 is a testament to just how visceral that instinct can become.

---

[14] Available at: http://www.antoniocasella.eu/nume/Wright_2010.pdf
[15] Available at: https://s3.amazonaws.com/static.nicic.gov/Library/023358.pdf

It is important not defer uncritically to an irrational guideline recommendation, or to let the "nature and circumstances of the offense" loom so large as to obscure all other considerations of sentencing. Mr. Jameson's history and characteristics show that he has achieved successes and lived a law-abiding life. The requested sentence is sufficient to steer Mr. Jameson from future offenses – particularly given the harsh collateral penalties this conviction will entail – while providing a warning to others that the consequences of child exploitation are severe, even for first time, nonviolent offenders. Further, when it comes to protecting society from Mr. Jameson, ensuring that he develops the skills and habits to continue to manage his mental health issues are the critical factor, not lengthy incarceration. Mr. Jameson has, through his acceptance of responsibility and more compellingly through his participation in mental health counseling, signaled his readiness to break his unhealthy addiction. It is now within this Honorable Court's discretion to give him that opportunity.

Respectfully submitted,
SCOTT JAMESON,
By his Attorney,


/s/Keren Goldenberg
Keren Goldenberg
BBO #657629
19A Alexander Ave.
Belmont, MA  02478
(617) 431-2701

Dated: March 24, 2024

### Certificate of Service

I hereby certify that this document will be filed through the ECF system on March 24, 2024, which will cause it to be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Keren Goldenberg*